UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LINDA SUE BROWN,                    :
                                    :CIVIL ACTION NO. 3:17-CV-779
          Plaintiff,                :
                                    :(JUDGE CONABOY)
          v.                        :
                                    :
NANCY A. BERRYHILL,                 :
Acting Commissioner of             :
Social Security,                    :
                                    :
          Defendant.                :
                                    :
_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (Doc. 1.) Plaintiff protectively filed a DIB application on March 3, 2014, claiming disability beginning on the same date. (R. 12.) After she appealed the initial denial of the claims, a hearing was held on April 13, 2016, and Administrative Law Judge ("ALJ") Paula Garrety issued her Decision on June 1, 2016, concluding that Plaintiff had not been under a disability during the relevant time period. (R. 23.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on June 5, 2017. (R. 1-3, 7-8.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on May 2, 2017. (Doc. 1.) She asserts in her supporting brief that the Acting Commissioner's determination is error for the following reasons: 1) the ALJ did

not include any manipulative limitations in the residual functional capacity evaluation; 2) the ALJ failed to provide a complete analysis of Plaintiff's obesity; 3) the ALJ misstated the evidence and failed to provide a proper evaluation of Plaintiff's subjective testimony; and 4) the ALJ does not support the weight given to the consultative examiner's opinion. (Doc. 20 at 15.) For the reasons discussed below, the Court concludes this matter is properly remanded to the Acting Commissioner for further consideration.

## I. Background

Plaintiff was born on February 26, 1963. (Doc. 20 at 5.) She has past relevant work as a hospital collections clerk. (R. 22.) The Disability Report indicates Plaintiff alleged that her ability to work was limited by fibromyalgia, herniated discs in her neck and back, shoulder problems, spinal stenosis, and depression. (R. 158.)

### A. Medical Evidence

Plaintiff's claimed errors involve specific evidence of record related primarily to alleged manipulative limitations and obesity. (*See* Doc. 20 at 12-28.) The Court's review will focus on that, evidence Defendant relies upon in response, and related evidence cited by the ALJ.

On January 22, 2014, Plaintiff had hand x-rays at Wilkes-Barre General Hospital. (R. 252-55.) Studies of the right hand showed minimal erosive changes of the proximal phalanx of the fifth digit

and mild degenerative changes of the distal interphalangeal joints. (R. 252.) Studies of the left hand did not show any significant degenerative changes but showed minimal soft tissue swelling. (R. 254.)

In February 2014, Plaintiff was seen by James Mattucci, M.D., of Orthopaedic Consultants of Wyoming Valley for complaints of right shoulder pain as well as numbness and swelling of her right hand. (R. 299-300.) Dr. Mattucci noted Plaintiff's history of musculoskeletal complaints and previous fibromyalgia diagnosis. (R. 299.) He recorded the following physical examination findings: full range of motion of both shoulders as well as the cervical spine; good biceps, triceps and forearm strength; equivocal Tinel and Phalen test on the right and negative on the left; excellent rotator cuff strength with no real discomfort; no tenderness in the AC joints; no exquisite tenderness in the area of the axilla and posterior triceps though Plaintiff indicated pain in these areas; and no reproducable numbness when pressure was applied to her axilla. (*Id.*) Dr. Mattucci's Impression was right shoulder pain and right hand numbness and pain. (R. 300.) He planned to repeat the EMG she had previously after which she said she was diagnosed with carpal tunnel syndrome to see whether she had the problem. (*Id.*) Regarding the hand problems, Dr. Mattucci reported that he told Plaintiff she may not improve with surgery if it were indicated because of the length of time she had the symptoms and he

3

thought her chronic pain manifestations were most likely due to fibromyalgia. (*Id.*)  He noted that Plaintiff reported conservative treatment in the past consisting of pain medication and braces, and she also said her symptoms had worsened over the preceding couple of years and she had gotten no relief. (*Id.*)  Regarding shoulder pain, Dr. Mattucci reported that he had nothing to offer Plaintiff and her exam was completely normal. (*Id.*)

On March 6, 2014, Plaintiff had an EMG to assess right hand numbness and rule out carpal tunnel syndrome. (R. 244.)  The Impression was mild carpal tunnel syndrome. (*Id.*)

On June 26, 2014, Jay Willner, M.D., conducted an internal medicine examination upon referral of the Bureau of Disability Determination. (R. 361-64.)  He recorded Plaintiff's chief complaints to be fibromyalgia, herniated disc in her neck, lower back pain, and chest pain of a muscular nature. (R. 361.)  Dr. Willner identified eight trigger points in his musculoskeletal examination: bilateral supraspinatus, bilateral gluteal, bilateral second rib, and bilateral knees. (R. 363.)  He further noted negative single leg raise bilaterally, no evident joint deformity, joints stable and nontender, and no redness, heat or effusion. (*Id.*)  Neurologic examination showed deep tendon reflexes physiologic on the left and 0 on the right, no sensory deficit, and 5/5 strength in the upper and lower extremities. (*Id.*)

On the referral of primary care provider James Tricarico,

D.O., Plaintiff was seen by rheumatologist Kevin Price Miller, D.O., in December 2014, for evaluation of psoriatic arthritis. (R. 378.) Dr. Miller noted that Plaintiff had last been seen in the clinic in 2010 with symptoms of fibromyalgia and less so psoriatic arthritis. (*Id.*) She reported that her current medication was not helping and she had psoriatric plaques on the thighs, hands, scalp, and intergluteal region, and it affected her nails as well. (*Id.*) Plaintiff also reported increased hand and knee pain since August, left greater than right, adding that her hand pain was worst at the MCP of her thumbs. (*Id.*) She said the pain worsened with activity. (*Id.*) Plaintiff complained of constant aches of her shoulders, neck, forearms, and chest that worsened with light touch and activity. (*Id.*) She said this pain was better with heat and warm soaks as well as ice. (*Id.*) Plaintiff further complained of shooting pain from her posterior shoulder that radiated down the ventral aspect of her arms, right greater than left. (*Id.*) Plaintiff wondered if this was related to the thoracic outlet syndrome which had been previously diagnosed. (*Id.*) Physical exam findings included the following: no focal or sensory deficits; normal and symmetric reflexes; and psoriatic plaques on the left wrist, intergluteal region, thighs, and scalp. (*Id.*) Musculoskeletal findings noted were multiple areas of tenderness to light touch including the typical trigger points, right wrist with decreased range of motion and left wrist more full, bony

enlargement of knuckles, right greater than left, knees with crepitus, and otherwise no evidence of joint stiffness, restriction of motion, swelling and redness diffusely. (*Id.*) Dr. Miller concluded that Plaintiff's symptoms were likely due to a variety of factors including fibromyalgia, osteoarthritis, and possibly psoriatic arthritis. (*Id.*) He thought the shooting pain down her arms was neurologic in nature, perhaps a pinched nerve. (*Id.*) Dr. David M. Pugliese, D.O., concurred with this assessment. (R. 382.)

On March 31, 2015, Plaintiff had another EMG for right hand and wrist pain. (R. 416.) Neil R. Holland, M.D., interpreted the study to be normal, finding no electrophysiologic evidence of entrapment neuropathy or motor axonal loss from cervical radiculopathy. (*Id.*) He noted that brief examination showed a markedly positive Finklestein's test and he thought clinically her wrist pain looked like a DeQuervain's tenosynovitis. (*Id.*)

Plaintiff saw David M. Pugliese, D.O., on April 7, 2015. (R. 421.) He assessed myalgias, psoriatic arthritis, and depressive disorder. (*Id.*) By history, he reported that Plaintiff had been having more weakness in her hands, arms and shoulders. (*Id.*)

At the request of Dr. Tricarico, her primary care provider, and Dr. Pugliese, her rheumatologist, Plaintiff saw Geisinger orthopaedic specialist Hans P. Olsen, IV, on October 21, 2015, for evaluation of complaints of bilateral upper extremity pain, right greater than left. (R. 498.) Dr. Olson noted that "palpation

about both upper extremities showed a lot of pain in her trapezial, posterolateral arm, and periscapular areas, especially right compared to left." (R. 499.) His Impression was cervical spine degenerative disk disease, fibromyalgia and myofascial pain symptoms, and no evidence of significant shoulder pathology. (*Id.*) Dr. Olson explained that he did not think Plaintiff's pain was shoulder related as it appeared to be more related to her fibromyalgia, neck degeneration, and myofascial discomforts. (R. 499-500.) Based on these findings, Dr. Olson noted that he told Plaintiff he did not have much to offer and referred her back to her primary care provider for referral to neurosurgery/spinal provider and pain management. (R. 500.)

Shoulder x-rays done on October 25, 2015, showed bilateral mild osteoarthritis. (R. 509.) Cervical spine x-rays of the same date showed mild degenerative disc changes. (*Id.*)

At her primary care follow up office visit on January 28, 2016, Dr. Tricarico noted that the orthopaedist felt Plaintiff's shoulder pain was cervical in nature and a neurology referral was denied by her insurance and MRI was denied. (R. 645.) Dr. Tricarico recorded that Plaintiff had arm/shoulder pain with minimal activity, worse on the right side. (*Id.*) Review of Systems was positive for decreased range of motion of the extremities with neck and leg pain as well as arm tingling. (R. 648.) Physical examination of the extremities showed no joint

deformities, effusion, or inflammation, no clubbing, or cyanosis. (*Id.*)  Dr. Tricarico's Assessment was neck pain, hand numbness, history of fibromyalgia, history of psoriatic arthritis, knee degenerative joint disease, and a history of insomnia.  (R. 648.) His plan included EMG and orthopaedic follow up for knees.  (*Id.*)

The March 29, 2016, EMG Report indicates the study was done by Birute Stewart, M.D., on Dr. Tricarico's referral to evaluate bilateral hand numbness and neck pain radiating to her arms.  (R. 688.)  Plaintiff reported hand weakness and finger numbness at night.  (*Id.*)  She also said that the symptoms had worsened over the preceding five years.  (*Id.*)  Physical examination demonstrated "decreased strength in some intrinsic hand muscles, give way weakness on exam.  Positive arm elevation sign bilaterally. Reflexes decreased.  Sensation is normal to pin." (*Id.*)  Dr. Stewart recorded the following impression.

> This is an abnormal study.  The electrophysiologic data is the most consistent with a chronic C7 radiculopathy on the right.  In addition, there is evidence of bilateral very mild median neuropathies at the wrist is it [sic] seen in carpal tunnel syndrome.  When compared with the same study performed in March 2015, cervical radiculopathy is a new finding.

(*Id.*)

The April 11, 2016, MRI of the cervical spine showed "[s]evere bilateral foraminal narrowing left greater than right at C5-6 due to uncovertebral arthropathy[;] [m]ild canal narrowing at C5-6[;]

[m]oderate right and mild left foraminal narrowing at C6-7 best appreciated in the sagittal views[;] [m]ild degenerative disc disease at C5-6 with anterior spurring." (R. 694.)

## B. *Opinion Evidence*

Dr. Willner, the consultative examiner, completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on June 26, 2014. (R. 365-70.) He opined that Plaintiff could occasionally lift and carry up to 100 pounds; she could sit/stand/walk for three hours without interruption and for five hours total in an eight-hour day; she did not need a cane to ambulate; she could occasionally use her hands to reach, handle, finger, feel, and push/pull; she could frequently operate foot controls with her feet; she could occasionally climb, balance, stoop, kneel, crouch, and crawl; and she could never be exposed to unprotected heights and occasionally be exposed to other noted environmental situations. (R. 365-69.) Dr. Willner identified "generalized pain" as the basis for his assessments. (R. 369.)

## C. *Function Report and Hearing Testimony*

## 1. **Function Report**

In the Function Report dated May 8, 2014, Plaintiff identified multiple sources of pain and stiffness as limiting her ability to work, including pain radiating down her arms into her fingers and numbness in her fingers. (R. 173.) She indicated her activities of daily living included cooking, cleaning, and doing laundry for

her family, and feeding the pets. (R. 174.) She noted that she could no longer fold clothes, carry things, open cans and jars, peel potatoes, lift pots, hang clothes, and do dishes. (*Id.*) She clarified that she prepared meals about three times a week and her husband helped with meals when she did not feel well. (R. 175.) She also said he helped with the cleaning and other chores. (*Id.*) Plaintiff said she got out about three times a week and shopped about once a week but that was sometimes limited by pain. (R. 176.) Plaintiff said she used a wheelchair on occasions when she had a fibromyalgia flare up or her back/legs hurt. (R. 179.)

## 2. **Hearing Testimony**

At the April 13, 2016, hearing, Plaintiff testified that she stopped working at her hospital collections job because the job was transferred to Bethlehem and she did not feel she could drive that far and it would have been a financial burden. (R. 39.) She elaborated that she was barely able to do her job toward the end of her employment and she used some vacation and personal days because she did not want to call in sick all the time and she sometimes went in late. (R. 39-40.) Plaintiff verified that she collected unemployment for six months after she stopped working. (R. 39.)

Regarding household chores, Plaintiff said her daughter, husband, and Dylan (an unrelated male who lived with the family) cooked and cleaned, her husband did the grocery shopping, and she did some simple cooking. (R. 40.) Plaintiff explained that she

had a hard time standing at the stove so she used her walker and she had trouble doing things like peeling potatoes because her hands were numb and weak.  (R. 40.)  Plaintiff said she drove around town but her husband did most of the driving.  (R. 41.) Plaintiff testified that she rarely used her cell phone and rarely used a computer.  (R. 42.)

Upon questioning by her attorney, Plaintiff explained that she could take care of personal care needs with some difficulty.  (R. 43.)  She clarified that her doctor recommended the walker after she asked him about it.  (R. 43-44.)  She also provided details about the problems she experienced when she was working, noting that she did stretches, used a heating pad and ice packs daily, and would rest in her van at lunch about three or four times a week because she was exhausted from the pain.  (R. 51.) Plaintiff also testified that she used a jazzy when grocery shopping and she had some trouble manipulating the controls.  (R. 55.)

When asked if she would be able to work a full eight-hour day at the job she had been doing, Plaintiff said that she would not because of the pain.  (R. 56.)  She added that she had the same job for thirty-five years but she started making more mistakes toward the end of her employment and was written up for her attitude.  (R. 57-58.)

Vocational Expert Patricia L. Chilleri ("VE") also testified.

(R. 60-61.) She identified Plaintiff's past relevant work as a hospital collections clerk to be a sedentary, skilled work activity. (*Id.*) The VE testified that the majority of the day would be spent keyboarding in that kind of job, from frequently to almost continuously with the DOT saying frequent. (R. 61.) The VE also said that the amount of phone work with a job like that would be frequent. (*Id.*)

## D. *ALJ Decision*

With her June 1, 2016, Decision, ALJ Garrety found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar and cervical spine; obstructive sleep apnea; fibromyalgia; thoracic outlet syndrome; psoriatic arthritis; and osteoarthritis of the bilateral knees. (R. 14.) She also found that the record contained additional diagnoses which did not have more than a minimal impact of Plaintiff's ability to do basic work activities including carpal tunnel syndrome, DeQuervain's tenosynovitis, obesity, anxiety, and depression. (*Id.*) ALJ Garrety determined that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment and she had the residual functional capacity ("RFC") to perform a full range of sedentary work. (R. 17.) Finding Plaintiff capable of performing her past relevant work as a hospital collections clerk, ALJ Garrety concluded that Plaintiff had not been under a disability as defined in the Social Security Act from March 3,

2014, through the date of the decision.  (R. 22.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S.

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step four of the sequential evaluation process when the ALJ found that Plaintiff could perform her past relevant work. (R. 22.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a

14

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error

would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

### IV. Discussion

As set out above, Plaintiff asserts the Acting Commissioner's determination is error for the following reasons: 1) the ALJ did not include any manipulative limitations in the residual functional capacity evaluation; 2) the ALJ failed to provide a complete analysis of Plaintiff's obesity; 3) the ALJ misstated the evidence and failed to provide a proper evaluation of Plaintiff's subjective testimony; and 4) the ALJ does not support the weight given to the consultative examiner's opinion. (Doc. 20 at 15.)

### A.    *Manipulative Limitations*

Plaintiff first argues the ALJ erred in failing to include any manipulative limitations in her RFC evaluation. (Doc. 20 at 16.) Defendant responds the ALJ was not obligated to include manipulative limitations in her RFC assessment because "the longitudinal evidence did not establish any significant manipulative limitations in terms of grasping, handling, fingering, or feeling." (Doc. 23 at 19 (citing R. 15).) The Court concludes the claimed error is cause for remand.

In her Decision, ALJ Garrety reviewed evidence she considered

In evaluating the claimant's allegations with regard to her manipulative functional limitations in terms of grasping, handling, and fingering, the undersigned carefully considered the clinical findings in the treatment records, which document occasional positive Tinel's signs, instances of swelling, particularly in the right thumb and 2nd finger, and 4th finger, as well as the index and second finger of the left hand (e.g. Exhibit 5), and decreased strength in some intrinsic hand muscles (Exhibit 21 F). However, the clinical findings also document multiple instances of essentially normal clinical findings, including repeated findings of no edema, joint deformities, effusion, inflammation, or other abnormalities (Exhibits 18F, 19F, 20F).  For instance, in January of 2016, while the claimant complained of hand numbness, her primary care physician noted a completely normal physical examination wherein he expressly noted that he found no edema, no joint deformities, no inflammation, and no other abnormalities in the claimant's extremities (Exhibit 20F, p.5).  Likewise, on consultative examination, Dr. Willner noted normal strength, sensation, and normal range of motion in the hands, wrists, and thumbs bilaterally (Exhibit 8F).  While not every physical examination notes completely normal clinical findings with respect to the claimant's hands and fingers, these two examples illustrate the clinical findings documented at various examinations throughout the course of the claimant's treatment.

Thus, when examined longitudinally, the medical evidence of record, including the above-noted diagnostic testing and clinical findings, does not establish any significant manipulative limitations in terms of grasping, handling, fingering, or feeling. The record simply does not establish that the claimant's carpal tunnel syndrome or DeQuervain's tenosynovitis has caused or is

18

> expected to cause more than minimal
> functional limitations for a period of at
> least 12 months.

(R. 15.)  This assessment is found in ALJ Garrety's discussion of

impairments following her conclusion that Plaintiff's carpal tunnel

syndrome and DeQuervain's tenosynovitis were not severe.  (R. at

14-15.)  In her RFC assessment, ALJ Garrety again addressed

manipulative limitations.  (R. 19.)

> With regard to the claimant's alleged
> difficulties in terms of grasping, handling,
> and fingering, as previously discussed at
> length, the longitudinal medical evidence of
> record does not establish any significant
> manipulative limitations with regard to the
> claimant's use of the hands.  Again, this
> conclusion is bolstered by the fact that the
> claimant was able to perform frequent to
> continuous keyboarding/clerical work up until
> the time of her separation from employment.
> Indeed, while the claimant testified that she
> does not use a computer often due to neck
> pain, she did not describe any difficulties
> keyboarding and she testified she has no
> difficulties dialing a phone.  The record
> simply does not support any specific
> limitations with regard to the use of the
> hands in terms of grasping, handling,
> fingering, or keyboarding.

(R. 19.)

Although the ALJ is correct that the record contains

"multiple instances of essentially normal findings" (R. 15), the

ALJ's analysis is flawed for several reasons.  First and foremost,

she fails to fully consider Plaintiff's claimed manipulative

limitations contextually and progressively.  Plaintiff regularly

said her hand pain and numbness worsened over time and worsened

19

with activity. (*See*, *e.g.*, R. 378, 421.) Her primary care doctor was concerned enough about complaints of worsening bilateral hand numbness and neck pain that he referred her for another EMG after her January 2016 office visit. (R. 648.) The doctor who did the EMG examined Plaintiff in the course of conducting the March 29, 2016, study found "decreased strength in some intrinsic hand muscles, give way weakness on exam. Positive arm elevation sign bilaterally. Reflexes decreased. Sensation is normal to pin." (R. 688.) He noted the EMG study was "abnormal" and confirmed that the cervical radiculopathy was a new finding compared to the March 2015 study. (R. 688.) Treating providers related symptomatic complaints which regularly included hand pain, numbness and tingling to established diagnoses such as fibromyalgia and cervical degeneration. (*See*, *e.g.*, R. 300, 378, 499-500.)

Other than a reference to "decreased strength in some intrinsic hand muscles" at step two (R. 15), ALJ Garrety did not mention the March and April 2016 findings in relation to manipulative limitations. (*See* R. 15, 19.) At step two, she noted that referenced diagnostic testing did not establish any significant manipulative limitations, but the referenced testing related only to carpal tunnel syndrome and DeQuervain's tenosynovitis. (*See* R. 14-15.) Although she concluded that the 2016 EMG and MRI findings "alone are insufficient to support greater limitations than those set forth in the above residual

functional capacity," ALJ Garrety does not explain why the findings *together with* Plaintiff's symptom reports and provider assessments do not support the need for manipulative limitations to be recognized in the RFC.[2]

"Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. Given this requirement and the deficiencies outlined above, the Court cannot conclude that the ALJ's determination that the "longitudinal medical evidence of record does not establish any significant manipulative limitations with regard to claimant's use of her hands" (R. 19) is supported by substantial evidence.

Furthermore, the Court concludes that functional evidence

---

[2] The ALJ does not meaningfully allow for cervical disc and fibromyalgia causation for upper extremity symptoms and relationship to manipulative limitations. Cervical radiculopathy symptoms can be aggravated by activity and typically include pain, weakness, or numbness which can progress along the entire arm and into the hand and fingers. *See* https://www.spine-health.com/conditions/neck-pain/cervical-radiculopathy-symptoms. Similarly, fibromyalgia symptoms may include numbness and tingling in the hands and symptoms can vary with activity level. *See* http://www.orthop.washington.edu/?q=patient-care/articles/arthritis/fibromyalgia.html.

Furthermore, when symptoms are verified and can be exacerbated by activity, the ALJ's analysis must address the issue of repetitive use in the work setting in the RFC determination.

21

cited by ALJ Garrety does not provide the support relied upon. The ALJ specifically cited Plaintiff's ability to perform her job as a hospital collections clerk and the fact that she left her employment for reasons unrelated to her medical conditions as evidence of a documented level of functioning that does not support greater limitations than those provided in the RFC.

> The claimant was able to perform frequent to continuous keyboarding/clerical work up until the time of her separation from employment. Indeed, while the claimant testified that she does not use a computer often due to neck pain, she did not describe any difficulties keyboarding and she testified that she has no difficulties dialing a phone.

(R. 19.)

The ALJ's assessment of this evidence is not completely consistent with the record. First, regarding her separation from employment, Plaintiff was asked whether she would have continued to work if the job had not been transferred (R. 39) and she explained that she was "barely" able to work toward the end of her employment, she was taking a lot of time off, and she was getting to work late because of symptoms related to her impairments. (R. 39-40.) Second, in her supporting and reply briefs, Plaintiff takes issue with ALJ Garrety's assessments regarding keyboarding and dialing a phone, asserting that she was not asked about performing these tasks and she testified that she took her entire lunch break to rest in an attempt to recover from the pain of working and discussed the difficulties of using a phone. (Doc. 20

22

at 27; Doc. 24 at 6.)  These discrepancies and evidence of worsening conditions as confirmed in 2016 diagnostic studies undermine the ALJ's reliance on the employment evidence cited.

For the reasons discussed above, the Court cannot conclude that the ALJ's RFC assessment is supported by substantial evidence. In particular, the ALJ's findings regarding Plaintiff's symptoms and impairments related to manipulative limitations are to be reconsidered and further evidence regarding the potential causes of the claimed limitations as well as the medical significance of clinical and diagnostic findings is to be sought as needed for a thorough medically-sound assessment.

This conclusion directly impacts two other errors claimed by Plaintiff: the evaluation of her subjective testimony and the weight given to part of the consultative opinion.  (Doc. 20 at 15.) Reconsideration of subjective testimony includes testimony about her abilities related to manipulative functions, evidence related to symptoms associated with her upper extremities, and evidence related to the decline in her condition from the time she stopped working until the time of the hearing and ALJ's decision.  Because the Court has concluded that the ALJ's manipulative limitation conclusions are not supported by substantial evidence and because the ALJ discounts Dr. Willner's limitation of Plaintiff to occasional use of the hands for the same reasons (*see* R. 21), reconsideration of Dr. Willner's opinion should encompass a

23

detailed explanation of this limitation and further fact-finding as needed.

**B. *Obesity***

Plaintiff contends the ALJ erred in failing to provide a complete analysis of her morbid obesity. (Doc. 20 at 24.) Defendant responds that the ALJ properly evaluated obesity pursuant to SSR 02-1p. (Doc. 23 at 19.) Because remand is required for the reasons outlined above, the Court concludes further consideration of the effect of Plaintiff's obesity should be further discussed on remand.

As recognized by the parties, SSR 02-1p, 2002 WL 34686281, at *1, requires an ALJ to "consider" the effects of obesity at pertinent steps of the sequential evaluation process and does not explicitly require discussion at each stage. (Doc. 23 at 20-21; Doc. 24 at 4.) However, because "discussion" of the issue allows the Court to determine whether the effects of obesity have been properly considered, the better approach is to explicitly discuss the matter at the relevant stages of the sequential evaluation process.

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal is properly granted and this matter is remanded to the Acting Commissioner for further consideration consistent with this Memorandum. An appropriate Order is filed simultaneously with this

24

action.

                              S/Richard P. Conaboy
                              RICHARD P. CONABOY
                              United States District Judge

DATED: March 14, 2018